Richard **ESSERY**, Petitioner,

v.

**DEPARTMENT OF TRANSPORTATION, NATIONAL TRANSPORTATION SAFETY BOARD; Federal Aviation Administration, Respondents.**

No. 86–7347.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1988.

Decided Sept. 19, 1988.

John B. Sidell, Harmsen, Carpenter, Sidell & Olson, San Diego, Cal., for petitioner.

Vivian B. Weisner, Office of the Chief Counsel, F.A.A., Washington, D.C., for respondents.

Steffanie D. Parker, Alexandria, Va., Helicopter Ass'n Intern., for amicus.

Before TANG, FLETCHER and PREGERSON, Circuit Judges.

TANG, Circuit Judge:

Essery petitions for review the revocation of his commercial pilot certificate by the National Transportation Safety Board (NTSB). The Federal Aviation Administration (FAA) revoked the certificate after finding that Essery violated FAA regulations in two incidents: (1) towing a banner over San Diego by plane and (2) delivering a Santa Claus to a downtown San Diego intersection by helicopter. Administrative Law Judge Davis held an evidentiary hearing, after which he agreed that Essery had violated FAA regulations, but found the revocation sanction too severe. He imposed a 120–day suspension sanction. On appeal the NTSB reinstated the revocation sanction. We affirm the determination that Essery violated FAA regulations in the two incidents, and reverse the revocation sanction and reinstate the 120–day suspension.

## FACTUAL AND PROCEDURAL BACKGROUND

Essery is a professional pilot and the holder of a commercial pilot certificate. He has been a pilot for nearly twenty years and has logged nearly 7,000 hours of flight time in various types of aircraft. Prior to these proceedings his flying record was violation free. Essery derives his livelihood from his one-half interest in Volar Corporation, d/b/a Golden State Aviation, which sells fuel and pilot supplies, does aircraft repair work, conducts aerial advertising flights, and maintains FAA-approved ground and flight schools.

On August 2, 1983, Essery piloted a banner-towing airplane over the downtown San Diego area. He first received an FAA air traffic controller's conditional approval for the flight. The approval was granted on the condition that Essery maintain Visual Flight Rules (VFR) at or below 1,000 feet (which was the current cloud ceiling).

FAA Safety Inspector Roy Billings observed the flight from four different downtown locations. Billings testified that in his opinion Essery violated FAA regulations by flying at an altitude of 500 feet near and above 300–feet buildings. He also opined that Essery violated FAA regulations by flying at such a low altitude that a forced landing would have endangered individuals or property.

On December 20, 1983, Essery, piloting a Robinson R22 helicopter, landed in a cordoned-off intersection in downtown San Diego to deliver a passenger dressed as Santa Claus. Before the flight, Warren Scheidel, an employee of Golden State Aviation, contacted the FAA to obtain its permission. The FAA, through Inspectors William Gamble and Billings, did not approve the operation. At oral argument the NTSB admitted that the FAA will not, under any circumstances, give pre-flight approval for a helicopter landing operation. Gamble

and Billings informed Scheidel that the flight concerned them because there would be no place for the helicopter to land in an emergency. The intersection, which is surrounded by high-rise buildings, would be congested with pedestrians at the time of the flight. Moreover, Gamble was concerned because the type of helicopter Essery planned to use for the flight had shown a tendency to throw a blade. Scheidel relayed the FAA's concerns to Essery. Essery testified that he addressed those concerns before and during the flight. He also stated that, although earlier models of the helicopter could shed a blade, the problem had since been corrected by the manufacturer.

The exact circumstances of the landing were disputed. ALJ Davis found, however, that the intersection was barricaded and cordoned off with string. Police officers were at the drop point to assist in crowd control. Just prior to the drop, approximately one hundred people were in the immediate vicinity; other people were in the area adjacent to the drop site. Essery testified that he flew over the area prior to landing to be certain he had a clear approach and landing area. According to police officers, however, several people walked under the flight path of the helicopter as it approached the drop site.

On June 15, 1984, the FAA Administrator (the Administrator) revoked Essery's commercial pilot certificate because of the two incidents. Essery appealed the order. An evidentiary hearing was held before ALJ Davis on October 24, 25 and 26, 1984. ALJ Davis found that Essery could not have made a non-hazardous emergency landing in either incident. He also found with regard to the helicopter flight that the people around the barricaded area created an unsafe condition. With respect to the tow flight he noted that Essery had conceded that he flew within 1,000 feet of the tops of high rise buildings, a violation of FAA regulations; moreover, he found that the action was not excused by the air traffic controller's clearance since such clearance does not allow a pilot to deviate from a federal aviation regulation. However, ALJ Davis modified the Administrator's sanction and ordered that Essery's certificate be suspended for 120 days, sixty days for each incident, rather than revoked. The modification was based on ALJ Davis' review of sanction orders in other cases and the circumstances of this case.

ALJ Davis' decision was appealed by both parties to the full NTSB. Because two incidents involving hazardous low flights in violation of FAA regulations were established, the NTSB reinstated the revocation sanction. Essery subsequently filed this petition for review. We have jurisdiction pursuant to 49 U.S.C. § 1486 (1982).

## STANDARD OF REVIEW

The scope of review of administrative agency decisions is narrow; we will uphold such decisions unless they are "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A) (1982). The NTSB's factual findings are conclusive when supported by substantial evidence in the record. *Meik v. NTSB,* 710 F.2d 584, 586 (9th Cir.1983). Purely legal questions are reviewed de novo. *Go Leasing, Inc. v. NTSB,* 800 F.2d 1514, 1517 (9th Cir.1986).

## DISCUSSION

### I.

■ Essery argues that the NTSB erroneously applied Federal Aviation Regulation [FAR] § 91.79 to the helicopter drop.[1] Section 91.79 provides in pertinent part:

*Except when necessary for take off or landing,* no person may operate an aircraft below the following altitudes:

(a) Anywhere. An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

---

1. Nowhere does Essery argue that the NTSB erred in finding that he violated Sections 91.-79(a) and (b) when he flew the banner-towing airplane. That issue is therefore deemed abandoned. Fed.R.App.P. 28(a)(2); *Collins v. City of San Diego,* 841 F.2d 337, 339 (9th Cir.1988).

(b) Over congested areas. Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft.

(c) Over other than congested areas. An altitude of 500 feet above the surface except over open water or sparsely populated areas. In that case, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

(d) Helicopters. Helicopters may be operated at less than the minimums prescribed in paragraph (b) or (c) of this section if the operation is conducted without hazard to persons or property on the surface. In addition, each person operating a helicopter shall comply with routes or altitudes specifically prescribed for helicopters by the Administrator.

14 C.F.R. § 91.79 (emphasis added).

Essery argues that the regulation's prefatory clause exempts low altitude maneuvers when those maneuvers are "necessary for takeoff or landing." Therefore, according to Essery, because he was taking off and landing during the helicopter operation, his low altitude maneuvers are exempt from the strictures of FAR § 91.79. The NTSB rejected that argument, finding that in order to show that a low altitude was "necessary for takeoff or landing" Essery must show that the landing site was appropriate. The cordoned-off intersection, in the middle of a congested area, was not, the NTSB asserts, an appropriate landing site.

In *Cobb v. NTSB*, 572 F.2d 202 (9th Cir. 1977), this court upheld the NTSB's determination that Cobb and O'Connor violated FAR § 91.79(c). *Id.* at 203. They flew an airplane within ten to sixty feet of people, vehicles, and structures and landed on a taxiway, although two runways were available. Like Essery, they argued that the prefatory clause exempted them from the minimum altitude limitation because flying within 500 feet of people, vehicles and structures was necessary to land the aircraft. We stated:

Because no need to use the taxiway as a runway was shown, we are in agreement with the NTSB that this low flight was not "necessary" as the term is used in section 91.79(c). Therefore we conclude there was substantial evidence supporting the violation of 91.79(c).

*Id.*

Essery attempts to distinguish *Cobb* on the ground that it has not been alleged that he used anything other than optimum approach or departure routes or that he engaged in any unnecessary maneuvers during landing or takeoff. He notes that a helicopter glides, and is capable of landing safely in a clear area of appropriate size even without power. With power, a landing can be aborted at the last minute.

We recognize that helicopters have unique characteristics and capabilities. We are unconvinced, however, that a take-off or landing conducted without unnecessary maneuvers is immune from the strictures of FAR § 91.79 even if the landing site was not unduly hazardous. The NTSB's reading of the regulation is reasonable, and we must give deference to the FAA's interpretation of its own regulations. *Ferguson v. NTSB*, 678 F.2d 821, 825 (9th Cir.1982). Although the evidence was conflicting, substantial evidence supports the NTSB's finding that the landing site was inappropriate.

Finally, Essery asserts that requiring him to establish the appropriateness of the landing site violates his due process rights because such a requirement does not appear in the regulation. We are concerned over the lack of clear standards to guide and provide notice to helicopter pilots. *See Administrator v. Marthens*, 13 CAB 488, 488–89 (1949). However, given our decision in *Cobb*, and other NTSB decisions, *see, e.g., Administrator v. Lewis*, 3 NTSB 878, 880 (1978) (NTSB Order No. EA–2266), *aff'd, Lewis v. Bond*, 634 F.2d 634 (9th Cir.1980), Essery was provided with fair notice of this application of section 91.79. *See Go Leasing*, 800 F.2d at 1525 (potential vagueness, which serves as the basis for a constitutional challenge to an enactment,

may be mitigated by judicial interpretation of the provision). Accordingly, we uphold the NTSB's finding that the "Santa Claus drop" violated FAR § 91.79(d).

## II.

■ Essery next contends that the NTSB's finding that he violated FAR § 91.9 during both the Santa Claus drop and the banner towing operation is not supported by substantial evidence in the record. Section 91.9 provides:

No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

14 C.F.R. § 91.9.

In *Administrator v. Reynolds,* NTSB Order No. EA–1770 (1982), the NTSB acknowledged that a FAR § 91.9 violation is not established simply by pointing to the potential harm that might have occurred as a result of an aircraft operation. The Administrator must show either that the likelihood of potential harm was unacceptably high or that the pilot's exercise of judgment in the matter was clearly deficient. Sufficient evidence in the record exists to establish that both operations violated FAR § 91.9.

With regard to the helicopter drop, the evidence establishes that another helicopter pilot, Kappmeier, decided after evaluation not to undertake the operation. In addition, FAA Inspector Gamble opined that the operation was unsafe, basing his conclusion "on the lack of forced landing areas, inability to control people in the street and shopping mall areas, [and] projected crowds of people four days before Christmas." Gamble's concerns were expressed to Scheidel, Essery's employee, and relayed to Essery. Two San Diego police officers who witnessed the operation while trying to control crowds testified that people were underneath the flight path of the helicopter, and only the 48' by 57' cordoned-off quadrangle remained free from traffic and available as a landing site.

The banner tow flight presents a closer question. The NTSB asserts that the finding that Essery was as low as 200 feet above the tops of the high rise buildings, which establishes a violation of FAR § 91.79, is sufficient to support a finding that FAR § 91.9 was violated. To some extent, Essery's actions are explained by the air traffic controller's admonition to fly at or below 1000 feet. As ALJ Davis observed, however, Essery was not excused from adhering to FAA regulations. The NTSB's finding that Essery flew within 200 feet of the tops of high-rise buildings is supported by substantial evidence in the record. That finding sufficiently establishes that Essery operated the airplane in a careless manner "so as to endanger the life or property of another."

Essery argues that the only potential harm resulting from either flight was the harm that could have occurred had there been a crash landing, "a danger inherent in each and every flight." That argument ignores the fact that FAR § 91.79 requires pilots to maintain an altitude sufficient to allow an emergency landing without undue hazard. If § 91.79 is obeyed, therefore, the danger of a crash landing *as a result of low altitude* is not "inherent in every flight." We affirm the NTSB's conclusion that Essery violated FAR § 91.9.

## III.

■ Finally, and most importantly, Essery contends that the NTSB abused its discretion when it modified ALJ Davis' 120–day suspension sanction by reinstating the Administrator's order of revocation. The relevant inquiry for this court is whether the sanction imposed is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Go Leasing,* 800 F.2d at 1518. "The arbitrary and capricious standard requires a 'wide deference' be given to an agency's choice of sanctions." *Id.* (*quoting Holmes v. Helms,* 705 F.2d 343, 347 (9th Cir.1983) (per curiam)).

The Administrator's Order of Revocation stated that Essery:

... failed to exercise the degree of care, judgment and responsibility required of the holder of a commercial pilot certificate; and

... demonstrated that [he] presently lack[s] the qualifications required of the holder of a commercial pilot certificate. ALJ Davis disagreed with those findings. He observed that the low banner flight may have resulted in part from the Air Traffic Controller's instruction to maintain visual flight rules at or below 1,000 feet. He noted that "low flying cases" generally result in a thirty-day suspension for a first offense. He imposed a sixty-day suspension for the tow flight. With regard to the helicopter operation, ALJ Davis analyzed other helicopter sanction cases involving low altitude maneuvers and determined that, under the standards set forth in those cases, a sixty-day suspension would be sufficient. Finding that Essery behaved carelessly, but not recklessly, he stated: "Revocation, in my opinion, is too harsh and does not appear to be consistent with the guidelines enunciated above."

Essery, of course, agrees with ALJ Davis' analysis of the sanction issue. He further asserts that the NTSB abused its discretion by finding revocation warranted in this case when other cases involving similar or more egregious facts have warranted no more than a suspension. He also points to his twenty year spotless flying record as indicative of his ability to exercise the care and judgment required of the holder of a commercial pilot certificate.

In support of its reinstatement of the Administrator's order of revocation, the NTSB argues that *Butz v. Glover Livestock Commission Co.*, 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973), is dispositive. In *Butz* the Secretary of Agriculture suspended a stockyard operator's registration for twenty days. The Eighth Circuit reversed the sanction order on the ground that it was contrary to the Secretary's past practice. The Supreme Court reversed, holding that a sanction within the authority of an agency is not rendered invalid in a particular case because it is more severe

thanctions imposed in other cases. *Id.* at 187, 93 S.Ct. at 1458. An administrative agency's choice of sanction is not to be overturned unless it is unwarranted in law or without justification in fact. *Id.* at 185–86, 93 S.Ct. at 1458.

The sanction in this case, however, differs from the sanction imposed in *Butz* in an important respect: the FAA, unlike the Secretary of Agriculture, operates under a specific policy mandating uniformity of sanctions. The FAA's enforcement manual[2], which sets forth criteria FAA officials are to use when recommending an appropriate sanction, states:

> Each region must make every effort to achieve uniformity of enforcement action. *Similar violations under similar circumstances should result in the same type of enforcement action and sanction....* all personnel must remain alert to actions which have been taken on similar violations in other regions as well as within their own region, to achieve the overall goal of national uniformity.

Department of Transportation, Federal Aviation Administration Order No. 2150, ¶ 203c.3. It is unquestioned that revocation is a sanction within the FAA's authority. *See* 49 U.S.C. § 1429(a) (1982) (authorizing the Administrator of the FAA to issue orders suspending, revoking, amending, or modifying aviation certificates if he "determines that safety in air commerce or air transportation and the public interest requires"). It is also unquestioned, however, that revocation is a much more severe sanction than has been imposed in the past for similar violations.

For example, in *Cobb*, 572 F.2d at 203–04, Cobb and O'Connor landed their airplanes on a diagonal runway, flying within ten to sixty feet of people, vehicles and structures. There was also substantial evidence that they engaged in a "dogfight" over the airport and that they barely avoided a power line running in front of the

---

**2.** In *Capuano v. NTSB*, 843 F.2d 56 (1st Cir. 1988), the First Circuit held that the FAA enforcement manual is not required by the Freedom of Information Act [FOIA], 5 U.S.C. § 552 (1982), to be published in the Federal Registrar. The *Capuano* court held that FOIA § 552(a)(2) only requires that the Manual be made available for inspection. *Id.* at 58. That question was not presented to us and we do not decide it here. We do hold, however, that the FAA is bound by its own internal guidelines and rules.

airport. Their activities were held to have violated FAR §§ 91.79(c) and 91.9. This court upheld the NTSB's 180-day suspension of their certificates. 572 F.2d at 204. Essery's conduct does not approach the severity of the conduct sanctioned with suspension in *Cobb*. During the banner tow flight, Essery flew within 200 feet of the tops of high-rise buildings. He was not near people or engaging in aerial showmanship. The same holds true for the helicopter landing operation. Essery conducted the operation with an eye towards satisfying the FAA's pre-flight safety concerns. Although the NTSB's after the fact findings that his execution of the flights violated safety regulations are supportable, *see infra* sections I and II, ALJ Davis' finding that he behaved "carelessly" rather than "recklessly" is also supported by substantial evidence in the record. The only hazard Essery created stemmed from the possibility of engine failure.

In addition to *Cobb*, Essery points to numerous other cases involving the same or more egregious conduct where only suspension was found to be warranted. *See, e.g., Administrator v. Richards*, 3 NTSB 3044, 3045 (1980) (NTSB Order No. EA–1516) (based on NTSB precedent in a "similar" case, helicopter pilot's suspension reduced from ninety to forty-five days; the pilot landed without prior notice in a shopping mall parking lot and left the helicopter running, attended only by a non-pilot passenger, while he conducted personal business in the mall; adults were forced to restrain children from approaching the helicopter). On the other hand, cases where revocation has been found appropriate involve clearly hazardous, reckless behavior. *See, e.g., Administrator v. Moore*, 3 NTSB 40 (1977) (NTSB Order No. EA–953) (pilot, on three separate occasions, turned the tail of a large aircraft towards a ramp where passengers were deplaning, causing heavy prop wash over the passengers); *Administrator v. Sorenson*, 3 NTSB 3456 (1981) (NTSB Order No. EA–1586), *aff'd*, 684 F.2d 683 (10th Cir.1982) (pilot operated aircraft while intoxicated); *Administrator v. Burnfin*, 3 NTSB 3447 (1981) (NTSB Order No. EA–1583) (pilot flew, with six passengers on board, in controlled airspace without appropriate air traffic control clearance, with the flight terminating with a crash into a mountain obscured by clouds).

At oral argument the NTSB did not refute Essery's contention that the violations for which his certificate was being revoked had in the past been sanctioned with thirty or sixty day suspensions. Instead it cited *Administrator v. Pease*, NTSB Order No. EA–2255 (1985), for the proposition that flight conduct indicative of a disregard for safety regulations demonstrates a lack of care, judgment and responsibility and warrants revocation. In *Pease*, however, the NTSB observed that it "has found revocation an appropriate sanction in a narrow range of cases involving deliberate disregard for aviation safety and the rights of others." *Id.* at 10. The proper standard for revocation "is not whether specific violations demonstrate a failure to exercise the necessary qualifications of a certificate holder, but rather whether they demonstrate that the holder no longer possesses such qualifications." *Administrator v. Wood*, 3 NTSB 3974, 3975 (1981) (NTSB Order No. EA–1702). Our review of past revocation cases convinces us that, while Essery's behavior was careless, at worst, each incident involved mistakes in judgment at an isolated time. Even together, the incidents do not show that Essery operates in disregard of safety regulations or presently lacks the ability to exercise care, judgment and responsibility. Especially in light of Essery's extensive flying record, it is impossible to say on the basis of these incidents that he lacks those qualifications.

Finally, the NTSB argues that the two violations together are egregious enough to warrant the severe sanction of revocation. However, no basis exists for treating Essery as a repeat offender. The determination that he had violated FAA regulations in both incidents was made in the same proceeding. Prior to that determination, he had not been determined to have violated any FAA regulations in twenty years of extensive flying. Moreover, past cases involving multiple violations have not resulted in revocation unless the conduct was

much more severe than is the case here. *See, e.g., Administrator v. Hill,* NTSB Order No. EA–2409 (1986) (violations of FAR §§ 91.79(d) and 91.9 found in two helicopter incidents, one involving a low flight over fire fighters battling a burning field, another involving a flight with passengers into low clouds which resulted in a crash; pilot's license suspended for 180 days); *Administrator v. Pierce,* 2 NTSB 17 (1973) (NTSB Order No. EA–424) (evidence of ten helicopter flights twenty feet over a highway and fifty feet over people on a beach; although the pilot was noted to have numerous prior violations, including low helicopter flights, the NTSB reduced the sanction from revocation to a six month suspension).

We recognize that the NTSB is charged with enforcing safety and that the authority to issue appropriate sanctions is necessary to allow it to meet its obligation. However, the NTSB is not entitled to disregard its own rule requiring uniformity of sanctions. *Cf. Airport Parking Management v. NLRB,* 720 F.2d 610, 615 (9th Cir.1983) (the National Labor Relations Board "must, to avoid abuse of its discretion, either adhere to or explain its departure from earlier clearly articulated criteria constituting self-imposed limits on its discretion"). The only case the NTSB could cite where a finding was made that a pilot lacked the care, judgment and responsibility to hold a certificate based solely on the occurrence of two violations was a case following this one which used this case as precedent. The NTSB has given no satisfactory reason why Essery's conduct "warrants a greater or lesser penalty than has generally been imposed on others in the past for like violations." *Richards,* 3 NTSB at 3045. Accordingly, we reverse the NTSB's order of revocation and reinstate the ALJ's sanction of 120 days suspension.

## CONCLUSION

The NTSB's application of FAR § 91.79 to the helicopter drop is correct under *Cobb.* There is sufficient evidence to support the NTSB's determination that both flights violated FAR § 91.9, although the banner tow flight is a close call. The real problem is with the NTSB's reinstatement of the revocation order. *Butz* is not dispositive, given the FAA's enforcement policy of securing national uniformity and our review of other sanction cases. Given the NTSB's policy, and the facts involved here, revocation is too harsh a sanction. We affirm the findings that Essery violated FAR §§ 91.79 and 91.9, reverse the revocation order, and reinstate the 120–day suspension ordered by ALJ Davis.

AFFIRMED IN PART and REVERSED IN PART.